# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RODNEY R. SCHOEMANN, SR.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 09-802** |
| **F. DOUGLAS MURRELL** | **SECTION: "S" (3)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. #43) is **GRANTED**, and plaintiff's claims are **DISMISSED WITH PREJUDICE**.

## BACKGROUND

This matter is before the court on a motion for summary judgment filed by defendant, F. Douglas Murrell. Murrell argues that he is entitled to summary judgment because plaintiff's claims against him have prescribed. Plaintiff, Rodney R. Schoemann, Sr., contends the his claims against Murrell are not prescribed because his cause of action, which has a prescriptive period of one year, was not known or reasonably knowable until February 2008, and he filed this suit on January 29, 2009.

On September 23, 2004, Schoemann approached Murrell about purchasing shares of United Consulting Corporation stock. United Consulting was planning to merge with Stinger Systems, Inc., which manufactures stun-guns. Schoemann was interested in the stun-gun market and purchased 100,000 shares of stock in United Consulting at $0.75 per share. Schoemann paid Murrell $75,000 from his E*Trade account on September 29, 2004. The purchase agreement provided that the United Consulting stock was "freely tradable," *i.e.* unrestricted and could be sold to third parties.

Schoemann relied upon an opinion of Murrell's securities law attorney, Gary Henrie of Utah, that the shares were unrestricted. Murrell and Schoemann believed the stock to be freely tradable because Murrell was not an officer, director, or majority shareholder of United Consulting. When the shares were made public, Schoemann resold the stock for $967,901, and earned a profit of almost $900,000.

In 2005, the Securities and Exchange Commission began investigating the formation of Stinger. On July 22, 2005, the SEC issued a Wells Notice[1] to Stinger. On March 9, 2007, the SEC subpoenaed Schoemann compelling him to testify before the SEC, and demanding production of all documents related to the stock transaction. Schoemann immediately retained a securities attorney, and on March 14, 2007, Schoemann testified before the SEC about the stock transaction.

On July 19, 2007, the SEC issued a Wells Notice to Schoemann informing him that it was instituting an action against him for violating Section 5 of the Securities Act of 1933 15 U.S.C. § 77e.[2] On August 16, 2007, Schoemann submitted a reply to the Wells Notice in which he addressed

---

[1] A "Wells Notice" is a letter that the SEC sends to people or firms when it plans to bring an enforcement action against them. It indicates that the SEC staff has determined that it plans to recommend that the Commission bring an enforcement action, and invites the recipient to explain why he should not be sued by the Commission.

[2] At the relevant time 15 U.S.C. § 77e provided:

> (a) Sale or delivery after sale of unrestricted securities
> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly - -
>
> > (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

the SEC's allegation that the stock was restricted and the allegations regarding Murrell's relationship with the company. Schoemann argued that the shares were unrestricted because Murrell was not affiliated with Stinger, and Murrell's son independently ran the company. Specifically, he stated:

> The documentary evidence is consistent with the conclusion of the company's counsel that Mr. Murrell was not an affiliate of Stinger's corporate predecessor. The staff has simply chosen to disbelieve Mr. Murrell's description of the relationship he and his son had to the corporation . . .

---

> (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
>
> (b) Necessity of prospectus meeting requirements of section 77j of this title
> It shall be unlawful for any person, directly or indirectly--
>
> > (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or
> >
> > (2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.
>
> (c) Necessity of filing registration statement
>
> It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

3

> The staff's argument is not based on contemporaneous documentary evidence, which apparently shows that Matt Murrell, Doug Murrell's son, took all official corporate actions. Rather, the staff simply disbelieves that Matt Murrell was old enough or experience enough to run the company, and that Doug Murrell had all contact with potential buyers of the company . . .
>
> The staff has indicated that they simply do not believe that Matt Murrell was independent of Doug Murrell. As an initial matter, we understand that Matt Murrell lived thousands of miles away from his father. He is not mere putty, as the staff seems to infer, having earned a graduate degree from the University of Wisconsin at a later date. According to Matt Murrell's testimony, he researched and evaluated potential merger candidates . . . .
>
> Even if the staff's suspicions regarding Mr. Murrell's relationship with Stinger and its predecessor corporation are true, however, the result the staff proposes is draconian.

The SEC filed suit against Schoemann and Murrell. Murrell settled for $55,000 plus interest, but Schoemann chose to defend the stock transaction. The SEC eventually determined that the stock was not freely tradable and ordered that Schoemann disgorge his profits and pay prejudgment interest. Schoemann incurred over $400,000 in legal fees opposing the SEC's claim, including an unsuccessful appeal.

On January 29, 2009, Schoemann filed this suit against Murrell and his son, Matthew Murrell,[3] alleging that Murrell's securities law attorney's opinion regarding the nature of the stock was inaccurate because of negligent or intentional misrepresentations made by Murrell. Schoemann

---

[3] On October 1, 2009, the court granted Matthew Murrell's motion to dismiss for lack of personal jurisdiction.

4

seeks to recover the attorneys fees he expending defending the SEC's action against him, and for emotional distress and diminished earning capacity.

On March 6, 2012, Murrell filed a motion for summary judgment arguing that Schoemann's claims are prescribed because he filed suit more than a year after he began to sustain damages and knew or should have known of the alleged cause of action.

## ANALYSIS

**A.     Legal Standard**

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).  If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B.     Prescription**

Schoemann alleges tort claims under Louisiana law, and that this court has diversity subject matter jurisdiction under 28 U.S.C. § 1332. When a federal court sits in diversity, it applies the state substantive law, including the state prescription periods. See Guar. Trust Co. v. York, 65 S.Ct. 1464, 1470-71 (1945). Louisiana Civil Code Article 3492 provides that delictual actions are subject to a liberative prescription of one year that commences to run from the day the injury or damage is sustained.

"[P]rescription statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; thus, of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted." Carter v. Haygood, 892 S.2d 1261, 1268 (La. 1/19/2005). Generally, the party asserting prescription has the burden of proof. Eastin v. Entergy Corp., 865 So.2d 49, 54 (La. 2/6/2004). "However, if prescription is evident on the face of the pleadings, . . ., the burden shifts to the plaintiff to show that the action has not prescribed." Id. In other words, the plaintiff must establish a suspension or interruption of the prescriptive period. Bartucci v. Jackson, 245 Fed. App'x 254, 257 (5th Cir. 2007).

Here, the stock transaction occurred on September 23, 2004. The SEC subpoenaed Schoemann on March 9, 2007, and he retained counsel before he testified on March 14, 2007. On July 19, 2007, the SEC issued a Wells Notice to Schoemann informing him that it planned to institute an action against him because it believed that the stock in question was not freely tradeable. On August 16, 2007, Schoemann filed his Wells Notice reply arguing that the stock was freely tradeable because Murrell was not an officer, director, or majority shareholder of United Consulting,

and Matthew Murrell acted independently of his father. Therefore, Schoemann began incurring the claimed damages, *i.e.* attorneys' fees, in March 2007, and knew about the SEC's position regarding the nature of the stock by August 16, 2007, at the latest. He filed this tort action against Murrell on January 29, 2009. Thus, the action appears to be prescribed. However, Schoemann argues that the action is not prescribed due to the application of the doctrine of *contra non valentem*.

*Contra non valentem* is a jurisprudential doctrine whereby prescription is suspended when a person cannot file suit. Carter, 892 So.2d at 1268 (citing FRANK L. MARAIST AND THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 10-4(b), 22 (1996)). The Supreme Court of Louisiana has recognized four circumstances where the doctrine of *contra non valentem* is applied to suspend the running of prescription:

> (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
>
> (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;
>
> (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or
>
> (4) where the cause of action is neither known or reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant.

Marin v. Exxon Mobil Corp., 48 So.3d 234, 245 (La. 2010).

Schoemann argues that the *contra non valentem* "discovery rule" set forth in number four above applies to this action because his cause of action was neither known or reasonably knowable by him more than one year prior to his filing suit. Schoemann argues that his claim is based on Murrell's alleged misrepresentation to his securities law counsel which caused that attorney to opine

7

that the stock was freely tradable. Schoemann contends that he first discovered these alleged misrepresentations on February 7, 2008, when he read the SEC's complaint against Murrell. Schoemann argues that before that date he thought that the SEC's position regarding the nature of the stock was based on the timing of signatures.

*Contra non valentem* is only to be applied in exceptional circumstances and "will not exempt the plaintiff's claim from the running of prescription if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned." Id. at 245-46. "Further, 'prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage, . . . even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damages as a result of the completed tortious act.'" Id. at 246.

Schoemann has not met his burden of demonstrating that prescription was suspended by the *contra non valentem* discovery rule, because he knew or should have known that the SEC was questioning Murrell's relationship with the company. In his August 16, 2007, Wells Notice reply, Schoemann specifically argued that the stock was freely tradeable because Murrell was not was not affiliated with the company and Murrell's son independently ran it. Thus, it is evident that he knew as of this date that the SEC questioned Murrell's representations regarding his relationship to the company. Further, when Schoemann was subpoenaed by and received a Wells Notice from the SEC in 2007, he could have by reasonable diligence learned why the SEC was questioning the stock transaction. Additionally, in 2007, he first sustained the damages that he claims, *i.e.* attorneys' fees in connection with the SEC action against him. Because prescription begins to run from the date

that the plaintiff first suffers appreciable damages, and Schoemann sustained such damges and knew or should have know about his cause of action in 2007, his claims were prescribed by the time he filed this suit in 2009. Therefore, Murrell is entitled to summary judgment on this issue of prescription.

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. #43) is **GRANTED**, and plaintiff's claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 16th day of May, 2012.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**